UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
HASSAN S. MOHAMED,

                              :        **REPORT & RECOMMENDATION**

              Plaintiff,

                              :         **14cv8373 (GBD) (MHD)**

     -against-

                              :

NYU, et al.,

                              :

              Defendants.
-------------------------------X

TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:


     Pro se plaintiff Hassan S. Mohamed is a former employee of New

York University ("NYU"). He commenced this lawsuit on October 20,

2014, asserting that NYU and four individual defendants[1] had

violated his rights under Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. 2000e et seq., the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq., the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et

seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code §§ 8-101 et seq.

---

[1] Plaintiff sued the individual defendants as Alison Larry,
John Bradley, Jim Murihm, and Michel Modeca. (See Compl. p. 1).
In their motion papers, defendants correct the spelling of three
of these defendants to Alison Leary, Jim Merrihue, and Michael
Modica. (See, e.g., Declaration of Kuuku Minnah-Donkoh dated
February 10, 2015 ¶ 1; Defs.' Mem. 1). Accordingly, we utilize
defendants' spelling of their names below.

Identifying himself as "African," "dark," "Musl[i]m," "Arab," and sixty-two or sixty-three years of age, plaintiff describes his claims -- in a form complaint -- as failure to promote, unequal terms and conditions of employment, retaliation, constructive firing, and hostile work environment/harassment.

Defendants responded with a pre-answer motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). They assert that plaintiff (1) failed to exhaust his administrative remedies with the U.S. Equal Employment Opportunity Commission ("EEOC"), (2) failed to file his claim within the applicable statutes of limitations, and (3) pled insufficient factual allegations to pass muster under Rule 12(b)(6). Defendants ask that plaintiff's complaint be dismissed in its entirety, with prejudice.

For the reasons that follow and as set forth below, we recommend that the complaint be dismissed, but that some of plaintiff's claims be dismissed without prejudice to repleading. See infra pp. 85-87.

2

**BACKGROUND**

I. <u>How We Assess a Pro Se Complaint</u>

As an initial matter, we note the requirement, for purposes of a motion to dismiss, to "accept[] as true all factual allegations in the complaint, and draw[] all reasonable interferences in the plaintiff's favor." <u>Barrows v. Burwell</u>, 777 F.3d 106, 111 (2d Cir. 2015). This effort is often complicated, however, when a plaintiff is unrepresented. Relevant decisions are replete with examples of <u>pro se</u> litigants either presenting too much to the court -- in pleadings so voluminous as to essentially eviscerate the Rule 8 requirement that pleadings be "short and plain" -- or too little -- in threadbare complaints so empty as to render an attempt to understand the facts nearly, if not entirely, impossible. <u>See</u>, <u>e.g.</u>, <u>Gonzalez v. Wing</u>, 113 F.3d 1229, *1 (2d Cir. 1997) (affirming dismissal of <u>pro se</u> plaintiffs' 287-page "incredibly dense and verbose" complaint); <u>Prezzi v. Schelter</u>, 469 F.2d 691, 692 (2d Cir. 1972) (affirming dismissal of <u>pro se</u> plaintiff's 88-page, single-spaced complaint that "contained a labyrinthian prolixity of unrelated and vituperative charges that defied comprehension[,] fail[ing] to comply with the requirement of Rule 8"); <u>Ruggiero v. Mobile Crisis Team</u>, 2013 WL 8350363, *1 (D. Conn. Aug. 19, 2013)

3

(discussing dismissal of <u>pro se</u> complaint numbering 332 pages, supplemented by two additional filings of 219 and 127 pages each); <u>Benzo v. New York State Division of Human Rights</u>, 1997 WL 37961, *4 (S.D.N.Y. Jan. 31, 1997) (dismissing 444-page <u>pro se</u> complaint); <u>see also Wang v. Palmisano</u>, 51 F. Supp. 3d 521, 541-43 (S.D.N.Y. 2014) (dismissing <u>pro se</u>'s discrimination claims as "barebones and conclusory," having pled "only that Plaintiff is 56 years old and that he was not hired despite the fact that he was qualified"); <u>Ortiz v. Standard & Poor's</u>, 2011 WL 4056901, *3-4 (S.D.N.Y. Aug. 29, 2011) (dismissing <u>pro se</u> complaint "[w]ithout actual facts demonstrating discriminatory animus[, because] discrimination is just one possibility" for plaintiff's termination); <u>Payne v. Malemathew</u>, 2011 WL 3043920, *2 (S.D.N.Y. July 22, 2011) (dismissing <u>pro se</u> complaint that included "simply nothing . . . for which one might reasonably infer" discrimination).

Nevertheless, courts "remain obligated to construe a <u>pro se</u> complaint liberally." <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009). The Second Circuit has explained that

> [t]his policy of liberally construing <u>pro se</u> submissions is driven by the understanding that "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect <u>pro se</u> litgants from inadvertent forfeiture of important rights because of their lack of legal training."

Triestman v. Fed. Bureau of Prisons, 470 F. 3d 471, 475 (2d Cir. 2006) (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)). This obligation calls for reading pro se submissions "to raise the strongest arguments they suggest," Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007), which is "especially true when dealing with pro se complaints alleging civil rights violations." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145 (2d Cir. 2002). Yet -- and this is central to the motion before us -- "though we are obligated to draw the most favorable inferences that [plaintiff's] complaint supports, we cannot invent factual allegations that he has not pled." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010).

Here, both plaintiff's complaint and affirmation in opposition to defendants' motion to dismiss contain "'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007)). We will discuss below the legal sufficiency of plaintiff's claims. For now, we simply note that -- for purposes of providing background for, and assessing, defendants' 12(b)(6) motion -- we reconstruct the record by utilizing an "Opinion and Award" written in the wake of an arbitration between plaintiff's representative union and NYU. (See Ex. G to Minnah-Donkoh Decl.).

Our consideration of this decision is appropriate because "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)); accord Luna v. N. Babylon Teacher's Org., 11 F. Supp. 3d 396, 401 (E.D.N.Y. 2014); DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 59-60 (S.D.N.Y. 2010).

Still, our obligation to construe the facts in a light most favorable to plaintiff cuts both for and against relying on this document, which was provided only by defendants in their motion papers. Plaintiff at once appears to depend heavily on the very same document -- indeed, his meager filings are utterly incomprehensible without it -- while also opposing the arbitrator's decision and framing of the facts to some nebulous degree. (See Ex. F to Minnah-Donkoh Decl.). In any event -- both because plaintiff himself provides so little and because we recommend that most of his claims be dismissed without prejudice -- we provide factual history from the arbitration decision for purposes of background while simultaneously appreciating that plaintiff's own account of the facts might differ in some measure from what follows.

II. <u>Plaintiff's Employment and Union-Backed Arbitration</u>

Plaintiff Mohammed S. Hassan was born in Egypt in 1953. (Compl. ¶ II(D); Attach. 3 to Pl.'s Affirm. in Opp. [hereinafter "EEOC Intake"] p. 1). He was hired by NYU in July 1990 as an "Air Condition[ing] Eng[ingeer]." (EEOC Intake p. 1).

As described by an arbitrator's opinion dated August 7, 2012, by 2004 plaintiff had acquired the position of "First Operator" in a "central heating and cooling plant [that] distributed heat and chilled water to some of [NYU's Washington Square campus] and electricity to seven core buildings." (Ex. G to Minnah-Donkoh Decl. [hereinafter "Arb. Op."] pp. 2, 7). This plant was several decades old and "generally functioned by manually turning valves." (<u>Id.</u> at p. 2). The operation of the plant was split between two discrete sides, with "the boilers on one side and the refrigeration equipment or chillers and diesel generators on the other." (<u>Id.</u>). The arbitrator characterized the plant as "using old technology and equipment" and having "no digital controls and no central control room for the two sides." (<u>Id.</u>).

Plaintiff worked on the refrigeration side of the plant, "one of three employees on the shift in a position responsible for

starting up, shutting down and operating the diesel generators and the chillers." (Id. at p. 3). However, the arbitrator quoted plaintiff as representing that he occasionally assisted "in the winter on the other side." (Id. at p. 7).

Some time in 2010, NYU completely replaced the old plant with a "Cogeneration plant." (Id. at p. 3). This upgrade did away with the two-sided system of the old plant and replaced the manual operation with a "state of the art computerized monitoring and control system where the status of a pump or valve is changed with a click of a mouse." (Id.). The project, taking four years to complete at a cost of $125 million, supplies electricity, air, and heat to dozens of NYU buildings, and sells back excess power to the Con Ed grid. (Id.).

In the new plant, as in the old, there existed the position of "First Operator." (Id.). However, the First Operator position in the Cogeneration plant was something of a different job. Unlike in the old plant -- where a First Operator was only required to possess a license in refrigeration -- in the new plant, a First Operator needed both a refrigeration license and a steam license. (Id. at p. 4). Moreover, the Cogeneration First Operator was responsible for the whole plant, not only one part; would be in

8

charge of the new control room at times when an engineer was not present; and was one of only two staff-members on watch, instead of one of three. (Id.). Accordingly, given the differences between the new and old positions "and the use of high pressure gas, steam and combustibles all in the heart of a densely populated area, NYU determined that it needed employees with a higher level of knowledge, skills and credentials than was required by the old plant." (Id. at pp. 3-4).

The new job paid a higher wage and, anticipating the possibility that some of the old First Operators would not pass muster under the new requirements to be implemented, NYU -- in concert with the representative union -- created the legacy position of "Outside Plant Maintenance Mechanic" -- to which old First Operators unqualified for the new position would be assigned without any decrease in pay. (Id. at p. 4). In a "Memorandum of Agreement" ("MOA"), NYU and the union further agreed that "First Operators must be fully qualified, [and that] [a]ppropriate testing for skills will be required." (Id.).

Thereafter, in April 2010, plaintiff was excused from work -- along with some number of other First Operators -- and retrained full-time in the workings and operation of the new plant. (Id. at

p. 5). NYU began the hiring process in July. (<u>Id.</u>). As part of that effort, NYU administered a written test for which a passing score was 70 out of 100, and required an interview with representatives from NYU and the contractor hired to operate the new plant. (<u>Id.</u>; <u>id.</u> at p. 5). Ultimately, seven candidates took the exam. (<u>Id.</u> at p. 13). Six of the seven passed, while plaintiff failed with a score of 67. (<u>Id.</u>). Although he was nevertheless granted an interview on October 15, 2010, "it was the consensus of the panel that [plaintiff] was not qualified for the position." (<u>Id.</u> at p. 5).

Accordingly, in November 2010, plaintiff was given the position of Outside Plant Maintenance Mechanic. (<u>Id.</u>). Plaintiff appealed this decision to defendant Alison Leary, then a "Senior Vice President" with NYU, "stating that he was tired during the interview, having just come off a night shift and that he deserved the First Operator position." (<u>Id.</u>). This effort resulted in plaintiff being granted a second interview on December 13, 2010. (<u>Id.</u>). The identical panel reached the same conclusion that it had come to after the first interview, that plaintiff was not qualified to be a First Operator. (<u>Id.</u>).

In conjunction with his representative union, plaintiff filed a grievance against NYU, alleging that the university had violated a collective bargaining agreement ("CBA") by not installing plaintiff in a First Operator position with the new plant. (Id.). In substance, the union's argument was that plaintiff's seniority, incumbency, and relevant experience should have resulted in his obtaining a First Operator job. (Id. at pp. 6-9). The union asserted that the CBA only required that a covered applicant demonstrate "proven ability" for a new position and that "[n]either an exam nor an interview is any indication of proven ability." (Id. at p. 7).

Plaintiff testified on his own behalf at the arbitration proceeding. (See id. at pp. 7-8). The arbitrator noted that "he doesn't speak the English language that well." (Id. at p. 7). Plaintiff "became proficient with all [of the] machinery by using his hands, he said, explaining, 'It's hard to answer when they ask questions about machinery when the machinery isn't there.'" (Id.). He also elaborated on his request for a second interview, stating that, at the first interview, "he was exhausted and unable to fully comprehend the questions asked." (Id.). He added that the purpose of the second interview "was to fail me, not to pass me." (Id.). Plaintiff asserted that he was being retaliated against for a

complaint that he had lodged with Human Resources. (<u>Id.</u> at p. 8).
The arbitrator described this complaint as occurring "after a
supervisor had criticized him about a painting job he did in
September 2009." (<u>Id.</u>; <u>see also id.</u> at p. 14 (placing this event in
July 2009)). In plaintiff's words, "[s]ince that time, I've been
targeted." (<u>Id.</u> at p. 8).

Plaintiff also explained that, while he only had one of the
two required licenses when he applied for the position, he had
passed the related test and was waiting for his certificate. (<u>Id.</u>).
This apparently accorded with the MOA, which stated that "[w]here
permitted by regulations, employees holding one (1) of the two (2)
licenses may be deemed qualified provided they have undertaken the
process to become fully licensed and obtain the license within
eighteen (18) months." (<u>Id.</u> at p. 4).

Apparently, despite his unsuccessful application, NYU had
employed him in the Cogeneration plant in the role -- although
seemingly not with the title -- of First Operator from January 1,
2011 to June 6, 2011. (<u>Id.</u> at p. 8). Plaintiff testified that "he
worked more hours during that span than any other employee at the
plant -- often at night without any supervision." (<u>Id.</u>). Given this
experience, and his eventual acquisition of the second required

12

license, he insisted to the arbitrator that he was qualified to be a First Operator in the new plant. (Id.).

The union called two witnesses on behalf of plaintiff. The first, Brian McGullam, an engineer employed at the plant, confirmed that plaintiff had worked in the new plant in the first half of 2011 and that "[i]n his view, 'the change was minimal' and [plaintiff] 'is qualified for the new position.'" (Id.). Frank Nipoli, a First Operator in both the old and the new plants, explained that "[i]n the old job . . . he was not responsible for the heating and stayed on the refrigeration side, although he did occasionally work on the boilers. Now he said he is responsible for the heating as well and high voltage equipment for which he was trained by Con Ed." (Id. at p. 9). Mr. Nipoli characterized this as a "no real change in the job. We just monitor different equipment." (Id.).

Defendant John Bradley, then-Assistant Vice President for Technical Services for NYU, testified on behalf of the university. (Id.). He described the construction and operation of the new plant and characterized it as a "fundamentally different and more complex system" than the old plant. (Id.). He explained that plaintiff's failure to secure the new First Operator job was due to his test

score, interview performance, and then-lack of one of the two required licenses. (Id. at p. 10). He represented that the new position required "entirely different and new employee skill sets." (Id.). He also spoke directly to the interview process, which included only job-related questions on such topics as "safety, steam pressure, operation of steam turbines, general plant knowledge, and high voltage electricity," questions that were the same in all interviews. (Id. at p. 13). According to Mr. Bradley, plaintiff "didn't appear to have a grasp on some of the most fundamental points anyone in the plant should know." (Id.).

Based on this testimony, NYU maintained that the CBA provisions cited by plaintiff and the union were largely irrelevant to this dispute, an argument accepted by the arbitrator. (Id. at pp. 10-12). Moreover, the arbitrator concurred with NYU's central contention, that it had fully complied with the MOA that governed the effort to fill the new First Operator positions. (Id. at pp. 10-12). In so ruling, the arbitrator noted that (1) "[i]t was not until after NYU determined which incumbents qualified for the new positions and which of those positions remained open that NYU began the process of looking at candidates outside the bargaining pool" (id. at pp. 11-12), and (2) the union "agreed to and signed off on" the hiring process for the new plant. (Id. at p. 12). The

14

arbitrator also characterized any similarities between the two plants as existing only to the degree "that a propeller driven DC-7 can be equated with a Boeing 777." (Id.). He further emphasized the "dire consequences" that could result if the operation of the plant were mishandled. (Id. at p. 13).

With respect to plaintiff's assertion that he had worked in the new plant from January through June 2011, the arbitrator rejected the argument that this showed that plaintiff could perform as a First Operator. (Id. at p. 14). Apparently, the new plant "was not fully operational" until March 2011 at the earliest and "the old three person configuration was still in place until June 2011." (Id. at p. 15). Plaintiff "was still working the same shift and the same schedule" as he had when working in the old plant, and "[o]ther than testifying that he once started up a steam engine and that he did watch rounds taking readings, the log book for that period does not show that he did any trouble shooting or work on the new equipment." (Id.).

The arbitrator concluded his opinion by framing the union's obligation vis-a-vis plaintiff's grievance as one requiring "pro[of] by a preponderance of the evidence that NYU's exercise of its management rights was either arbitrary or pretextual or

discriminatory." (<u>Id.</u> at p. 14). He wrote that "[t]here is simply nothing in the record which would warrant overturning management's decision to deny the First Operator position to [plaintiff]." (<u>Id.</u>). On August 12, 2012, he issued his opinion denying plaintiff's grievance. (<u>Id.</u> at p. 15).

III. <u>Interaction with the Equal Opportunity Employment Commission</u>

Plaintiff retired on November 13, 2013. (<u>See</u> Ex. I to Minnah-Donkoh Decl.; <u>accord</u> Attach. 2 to Pl.'s Affirm. in Opp.; Def.'s Mem. 13 n.7).[2] On February 11, 2014 he filed a charge of discrimination with the EEOC. (<u>See</u> EEOC Intake). While the intake form does not include much detail, plaintiff checked the boxes indicating allegations of discrimination on the basis of race, age, national origin, and religion. (<u>Id.</u> at § 4). The form instructed that "[i]f you checked color, religion or national origin, please specify," but plaintiff left this line blank. (<u>Id.</u>). He also did not fill in the lines underneath the question that asked, "What happened to you that you believe was discriminatory?" (<u>Id.</u> at § 5).

_____

[2] While neither party provides a citation for the exact date of plaintiff's retirement, the November 13 date -- mentioned in defendants' memorandum in support of its motion -- accords with the general time-frame contained in various documents either written or filled-out by plaintiff.

Plaintiff did, however, name two individuals under the prompt, "Name and Title of Person(s) Responsible," listing defendants Jim Merrihue and Michael Modica (id.), who he categorized elsewhere in the intake form as his immediate supervisors at NYU. (See id. at § 3). The only factual substance that plaintiff included with his charge was included in response to the prompting question, "Why do you believe these actions were discriminatory?" (Id. at § 6). There, he wrote (as best we can discern) that he was "denied [a] pos[]ition I was qualified [for] and force[d] to retir[e] early by [NYU's] using pressure on me at work []." (Id.).[3]

Subsequently, on February 24, 2014, the EEOC apparently provided NYU with a "Notice of Charge of Discrimination,"[4] indicating that Mr. Mohamed had filed a claim premised on race, religion, national origin, and age discrimination and informing NYU

---

[3] The only other information provided by plaintiff to the EEOC at this stage was a statement that he had previously filed a complaint relating to this matter with the "NYU Equal Opportunity Office" and a list of the names and phone numbers of three individuals who had allegedly witnessed the discriminatory incidents. (See EEOC Intake at §§ 13-15).

[4] Defendants assert that this notice was only "purportedly mailed" by the EEOC but "never received" by NYU (Defs.' Mem. 3), an allegation that we further explore below. See infra p. 34 n.13.

that "[n]o action is required by you at this time." (Ex. C to Minnah-Donkoh Decl.).

On February 27 and May 15, 2014, the EEOC followed up on plaintiff's claim with identical letters to him requesting further information. (Exs. D & E to Minnah-Donkoh Decl.). These letters stated that "[t]he information you gave us is not enough to determine how we should handle this case. More information is needed before we can continue." (Id.). The letters further stated that "[o]ur experience is that an interview is the best way to obtain needed information" and directed plaintiff to call the agency "as soon as possible" in part "because charges of employment discrimination must be filed within the time limits imposed by law." (Id.). Finally, the letters warned plaintiff that "IF WE HAVE NOT HEARD FROM YOU WITHIN 30 DAYS OF THIS LETTER, WE WILL ASSUME THAT YOU DID NOT INTEND TO FILE A CHARGE OF DISCRIMINATION WITH US." (Id.).

On August 1, 2014, plaintiff emailed Ashraf Ahmed, a federal investigator with the EEOC, and attached a copy of the arbitrator's opinion and decision. (Ex. F to Minnah-Donkoh Decl.; see Attach. to Compl.). In the body of this email, plaintiff wrote a message which we parse as follows: "HERE IS THE ARB[I]TRATION DECISION[.] I WAS

18

T[AR]GET[ED], DISCRIMIN[I]NATED [AGAINST], [AND] HAR[RA]S[SED] BY NYU MAN[A]G[E]MENT TILL NOVEMBER OF 2013 WHEN I WAS FORCED TO RETIRE[]. I WOULD LIKE TO TAKE NYU AND THE AR[BI]TRATOR TO FED[E]RAL COURT." (Ex. F to Minnah-Donkoh Decl.).

On the same day -- seemingly in response to plaintiff's earlier email -- the EEOC sent plaintiff another letter, informing him that the agency was "in receipt of your recent request that you be issued a Notice of Right to Sue." (Attach. to Compl.). This document states little other than that "the agency determined that issuing you the requested Notice of Right to Sue is warranted given current workloads and the extent of additional information required to complete such an investigation," the latter point possibly a reference to the seemingly unanswered earlier letters requesting additional information. (Id.).

The Notice of Right to Sue, attached to that letter, stated that "[l]ess than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge" and that "[t]he EEOC is terminating its processing of this charge." (Id.).

19

IV.  <u>The Complaint</u>

Plaintiff filed his complaint in this court on October 20, 2014, utilizing the standard form "Complaint for Employment Discrimination" and attaching the Notice of Right to Sue. He targets NYU and individual defendants Alison Leary and John Bradley -- mentioned in the recitation of facts stemming from the arbitration decision -- and Jim Merrihue and Michael Modica -- listed in plaintiff's intake questionnaire submitted to the EEOC.

Plaintiff alleges discrimination under Title VII, the ADEA, the NYSHRL, and the NYCHRL. (Compl. p. 1). In the form complaint, he checks off the types of discrimination that he claims to have encountered: a failure to promote, unequal terms and conditions of employment, and retaliation. (<u>Id.</u> at pp. 2-3). Plaintiff also appears to plead both a constructive firing claim and a hostile work environment/harassment claim within his brief elaboration of the facts of his case.[5] The firing claim consists of conclusory allegations that NYU "[p]ut[] too much pressure and har[a]s[s]ment [on me, and] forced me to retire," while the hostile-environment

---

[5] We note that defendants themselves construe plaintiff's complaint as making out claims for constructive firing and hostile work environment/harassment. (<u>See</u>, <u>e.g.</u>, Defs.' Mem. 2).

claim is rooted in NYU's refusal to pay him "equal wages for 6 month[s,] with overtime[,] the new salary for 1st Operator." (Id. at p. 3).[6]

Plaintiff alleges that the discriminatory acts occurred in November 2013 and that he was discriminated against for his race ("African"), color ("dark"), religion ("M[u]slim"), and national origin ("Arab"). (Id.). While plaintiff does not check the box indicating that he believes that he was discriminated against for his age, he does include his date of birth -- April 8, 1953 -- which the form indicates is only appropriate "if you are asserting a claim of age discrimination." (Id.). Plaintiff also does not describe the relief he seeks, only writing that it is "to be determined." (Id. at p. 4).

_____

[6] The full, unedited description of the facts of the case as presented by plaintiff is as follows:

> N.Y.U. denied me promotion. Not paying equal wages for 6 month with overtime the new salary for 1st operator even doing the what they call a new position with the same title. Putting too much pressure and har[a]s[s]ment forced me to retire due to man[a]g[e]ment retaliation har[a]s[s]ment and ag[g]ravation which forced me to leave job.

(Compl. p. 3).

We note that nowhere in the complaint does plaintiff make direct reference to the arbitrator's decision or to the specific facts underlying the arbitration. However, defendants connect the dots between plaintiff's limited proffered facts, the documentary history of plaintiff's correspondence with the EEOC, and the arbitration (see Def.'s Mem. 2-4), which, as a matter of framing, at least, we find eminently reasonable and almost certainly correct.[7]

## DEFENDANTS' MOTION

Defendants have moved to dismiss the complaint with prejudice. (Docket nos. 12-16, 20-22). In sum, defendants assert (1) that plaintiff failed to exhaust his administrative remedies for his Title VII and ADEA claims (Defs.' Mem. 8-11), (2) that plaintiff's claims are entirely or almost entirely time-barred under applicable statutes of limitations (id. at 11-13), and (3) that plaintiff fails to state a plausible claim for any of his asserted causes of action. (Id. at 14-19; see also Defs.' Reply 2-6).

---

[7] That plaintiff's claims are grounded in the facts surrounding the arbitration appears especially likely given his affirmation in opposition to defendants' motion, in which he includes a brief, typed attachment that on its face does not at all contradict defendants' framing of the relevant issues. (See Pl.'s Affirm. in Opp.).

Plaintiff filed an Affirmation in Opposition to defendants'
motion, a submission that does not clearly address the arguments
made in defendants' memorandum. Plaintiff first states that the
motion should be denied because he has "enough co-worker[s] that
have personal knowledge about this case, and [are] willing to come
testify in court." (Attach. 1 to Affirm. in Opp.).

Plaintiff then proceeds to generally reiterate his claims by
writing, "I have a valid case against NYU supported by witnesses,
which NYU failed to stop the discrimination and harassment against
me while I was working at NYU." (Id.). He also states that,
"[d]uring the time I was working at NYU, I complained numerous
times to human resource[s] and NYU equal opportunity and nothing
has been done." (Id.). He asserts that "they launched an
investigation by the equal opportunity office and I've been told by
them there is nothing they could do. All they said, they were going
to talk to management." (Id.). He also alleges that "[t]he
discrimination and harassment continued until I left NYU, in
November 2013." (Id.).

Finally, plaintiff spends some time describing his
interactions with the EEOC. (Id.). He explains that "[w]hen I filed
with EEOC, it was closing time for the EEOC office, they gave [me]

23

an intake questionnaire form, and I filled it up in a hurry."
(Id.). He states that he was "told they would call me to explain
more of the case and continue to finish the questionnaire form."
(Id.). Plaintiff appears to represent that the letter dated
February 27, asking him for more information, was the first such
outreach by the EEOC. (Id.). Subsequently, the agency "assigned an
investigator which I called [] over the phone several times, and he
told me he is going to make an appointment for me to go down to the
office, and meet with [him], and he never made the appointment."
(Id.).

According to plaintiff, "[a]fter calling numerous times . . .
[the investigator] said he's going to assign a new investigator
that speaks my language, which he did, and I got in touch with the
new investigator [who] interviewed me over the phone." (Id.).
Plaintiff writes that "I emailed the new investigator with the
documents he needed." (Id.).[8] In the wake of this correspondence,
"an EEOC right to sue letter was issued." (Id.).

---

[8] Plaintiff does not mention the name of this investigator
or the contents of the document submission, but, see supra pp.
18-19, the context suggests that this is a reference to the
August 1, 2014 email from plaintiff to Investigator Ashraf Ahmed,
with the arbitration decision attached. (See Ex. F to Minnah-
Donkoh Decl.).

Plaintiff concludes by insisting that "I was answering EEOC all the time either by phone or email, and I was never late to apply when I g[o]t any notice or phone call from them and if there was an issue from my side, they wouldn't issue the right to sue letter." (Id.).

## ANALYSIS

Defendants' motion raises three arguments -- exhaustion, statute of limitations, and insufficient pleadings -- which we will address in the order presented.

## I. Exhaustion

Both Title VII and the ADEA require a claimant to timely file a charge with the EEOC prior to the commencement of litigation. See 42 U.S.C. § 2000e-5(e). The Second Circuit has long maintained that "[e]xhaustion of administrative remedies through the EEOC stands as 'an essential element of Title VII's statutory scheme.'" Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000) (quoting Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)); accord Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title VII claim in

federal court, a plaintiff must first pursue available
administrative remedies and file a timely complaint with the
EEOC."). Similarly, "[n]o action based on a claim of age
discrimination may be brought in federal court unless the claim was
properly raised with the EEOC." Talyansky v. Syracuse Language
Sys., 199 F.3d 1323, *1 (2d Cir. 1999) (quoting Miller v. Int'l
Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir. 1985)); see also Foster
v. (D.O.E.) Theatre Arts Prod. Co. Sch., 2014 WL 265787, *3
(S.D.N.Y. Jan. 24, 2014) ("[U]nder settled law in this Circuit, a
plaintiff must first raise an ADEA claim with the EEOC, prior to
filing suit in federal court.").


Exhaustion of the EEOC claims process generally takes the form
of filing a charge of discrimination with the agency. See, e.g.,
Kane v. 24/7 Real Media, 2015 WL 1623823, *2 (S.D.N.Y. Apr. 7,
2015) (citing Riddle v. Citigroup, 449 F. App'x 66, 69 (2d Cir.
2011)); Daniels v. Juniper Elbow Co., 2015 WL 1514446, *1 (E.D.N.Y.
Apr. 2, 2015). "The 'primary purpose' of filing a charge of
discrimination with the EEOC 'is to alert the EEOC to the
discrimination that a plaintiff claims she is suffering' in order
'to give the administrative agency the opportunity to investigate,
mediate, and take remedial action.'" Muhammad v. New York City
Trans. Auth., 52 F. Supp. 3d 468, § A (E.D.N.Y. 2014) (quoting

26

<u>Butts</u>, 990 F.2d 1397, 1401-02); <u>accord</u> <u>Fed. Express Corp. v.</u>
<u>Holowecki</u>, 552 U.S. 389, 398 (2008) (agreeing with "[t]he EEOC['s]
submi[ssion] that the proper test for determining whether a filing
is a charge is whether the filing, taken as a whole, should be
construed as a request by the employee for the agency to take
whatever action is necessary to vindicate her rights"); <u>Farren v.</u>
<u>Shaw Envtl.</u>, 510 F. App'x 44, 46 (2d Cir. 2013).

EEOC regulations describe a charge as a filing that (1) is in
written form, (2) identifies the parties, and (3) "generally"
describes the alleged discriminatory acts. <u>See</u> 29 C.F.R. §§ 1601.9,
1601.12(b); <u>see also</u> <u>Holowecki v. Fed. Express Corp.</u>, 440 F.3d 558,
566 (2d Cir. 2006), <u>aff'd</u>, 552 U.S. 389 (2008); <u>Jallow v. Office of</u>
<u>Court Admin.</u>, 2012 WL 4044894, *6 (S.D.N.Y. Sept. 4, 2012).

The Second Circuit has characterized these requirements as
"minimal," <u>Holowecki</u>, 440 F.3d at 566, and the Supreme Court has
echoed that "under this permissive standard a wide range of
documents might be classified as charges." <u>Holowecki</u>, 552 U.S. at
402. Indeed, the Supreme Court has also specifically emphasized
that "[i]n the administrative context . . . it appears <u>pro</u> <u>se</u>
filings may be the rule, not the exception . . . [and] [i]t thus is
consistent with the purposes of [the ADEA and Title VII] that a

charge can be a form, easy to complete, or an informal document, easy to draft." Id. at 402-03. Accordingly, courts have readily found that a so-called "Intake Questionnaire" may constitute a charge of discrimination where this minimal showing is made, although "the agency is not required to treat every completed Intake Questionnaire as a charge." Id. at 405; see also Robinson v. Macy's, 2014 WL 6997598, *6-7 (S.D.N.Y. Dec. 5, 2014); Harris v. NYU Langone Med. Ctr., 2013 WL 5425336, *2 (S.D.N.Y. Sept. 27, 2013).


At present, Intake Questionnaires are so readily held to constitute charges in large measure because

> since Holowecki was decided, the EEOC has modified its form Intake Questionnaire -- as the Supreme Court suggested it might -- to facilitate the determination whether such a questionnaire, in any particular case, constitutes a charge. Specifically, the EEOC has changed the [Intake Questionnaire] to require a claimant to clearly express his or her intent by checking one of two boxes, thereby forc[ing] claimants to decide whether their questionnaire is a request for the agency to take remedial action, such that courts can objectively determine whether each questionnaire is a charge of discrimination or merely a request for further information.

Brown v. City of New York, 2013 WL 3789091, *8 (S.D.N.Y. July 19, 2013) (internal quotations omitted).

Defendants in this case argue that plaintiff's Intake Questionnaire failed to constitute a charge of discrimination with the EEOC. (See Defs.' Mem. 9-11). We disagree.

At the outset, we easily dispense with defendants' assertion that "Plaintiff's intake questionnaire failed to indicate whether he sought to have the EEOC take remedial action or settle a dispute between him and NYU." (Id. at 10). Plainly, this is not the case. Plaintiff clearly checked the box on his Intake Questionnaire that indicated, "I want to file a charge of discrimination." (EEOC Intake p. 4).[9]

Defendants' repeated references to the letters dated February 27 and May 15, 2014 are similarly unavailing. Defendants quote the following lines from these letters: (1) "The information you gave us is not enough to determine how we should handle this case. More information is needed before we can continue." (2) "[Please contact me] as soon as possible because charges of employment

_____

[9] Notably, aside from that which is contained in defendants' introductory discussion on exhaustion (see Defs.' Mem. 8-9), the only case they cite for the proposition that a plaintiff's Intake Questionnaire reflects "no evidence of an intent by plaintiff to activate the EEOC's enforcement process" (id. at 10-11) is Simpson v. City of New York Dep't of Hous. Pres. & Dev., 2009 WL 996388 (S.D.N.Y. Apr. 13, 2009), a case filed prior to the Supreme Court's decision in Holowecki and the EEOC's adoption of the amended Intake Questionnaire form.

discrimination must be filed within the time limits imposed by law." (3) "IF WE HAVE NOT HEARD FROM YOU WITHIN 30 DAYS OF THIS LETTER, WE WILL ASSUME THAT YOU DID NOT INTEND TO FILE A CHARGE OF DISCRIMINATION WITH US." (Defs.' Mem. 10 (quoting Exs. D & E to Minnah-Donkoh Decl.)). Defendants then assert that the letters "clearly establish that Plaintiff's intake questionnaire did not contain sufficient information to enable the EEOC to discern the nature of Plaintiff's allegations or how to handle this case, if even at all." (Defs.' Mem. 10; see also Defs.' Reply Mem. 2-3).

It is true that these letters contain fairly explicit indications that the EEOC considered plaintiff's Intake Questionnaire to be substantively lacking in some way. The letters informed plaintiff, however, that "an interview is the best way to obtain the needed information" and that this interview "might be conducted in person or by telephone." (Exs. D & E to Minnah-Donkoh Decl.). In opposition to defendants' motion, plaintiff represents that he communicated with "EEOC all the time either by phone or email" and that he "was never late" to return "any notice or phone call from them." (Attach. 1 to Affirm. in Opp.). Plaintiff further explains that he filled out the Intake Questionnaire in haste because "it was closing time for the EEOC office" and that, after

delays on the part of the agency, his investigator eventually "interviewed [him] over the phone." (Id.).

Without squarely countering this narrative on reply, defendants imply their disbelief of plaintiff's version of events, writing that "[p]laintiff apparently places blame with the EEOC for his own abject failure to supply basic facts concerning his claims." (Defs.' Reply Mem. 3). To the extent that defendants are asserting that plaintiff did not comply with the directives contained in the EEOC's letters, we merely reiterate that, on a motion to dismiss -- especially one brought against a pro se plaintiff -- our responsibility is to "constru[e] the complaint [and incorporated pro se submissions] liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Falso v. Ablest Staffing Servs., 328 F. App'x 54, *1 (2d Cir. 2009) (quoting Chambers, 282 F.3d at 152); accord Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). We are in no position to assess the credibility of the parties on whether and to what extent plaintiff reached out to the EEOC in the wake of his filed Intake Questionnaire and the February and May 2014 letters.[10] Indeed, engaging in such an assessment --

---

[10] Without engaging in an extensive discussion of the issue, we note that plaintiff's narrative -- which paints the EEOC as an unresponsive and perhaps overburdened agency -- is not wholly

by weighing the credibility of plaintiff's assertions -- would be wholly inappropriate at this stage of the litigation. Defendants will of course be free to press the issue on summary judgment or at a trial.

Moreover -- and perhaps more importantly -- it is at least arguable (and seemingly uncontradicted), that the EEOC itself deemed the sum total of plaintiff's proffer to the agency to be a charge. The February 24, 2014 "Notice of Charge of Discrimination" labeled Mr. Mohamed as "Person Filing Charge" and explained that "[t]his is a notice that a charge of employment discrimination has been filed against your organization." (Ex. C to Minnah-Donkoh Decl.). Later, and subsequent to both the February 27 and May 15, 2014 letters to plaintiff, the EEOC provided Mr. Mohamed with his

---

inconsistent with courts' discussions of this well-documented phenomenon. See, e.g., U.S. E.E.O.C. v. Lockheed Martin Global Telecomm., Inc., 514 F. Supp. 2d 797, 803 (D. Md. 2007) ("The Court is sympathetic to the EEOC, an overburdened agency, charged with the daunting task of ensuring that only meritorious suits are filed."); Bond v. City of Middletown, 389 F. Supp. 2d 319, 330 (D. Conn. 2005) ("[T]he EEOC is overburdened with pending cases and lacks the resources to investigate all of those cases within the 180 day period."); Springer v. Partners in Care, 17 F. Supp. 2d 133, 141 (E.D.N.Y. Aug. 25, 1998) ("[I]t would be unconscionable to penalize a plaintiff, particularly one who is pro se, for the neglect or inefficiencies of an administrative agency that is overburdened by the high volume of discrimination claims it receives each year.").

Notice of Right to Sue. (Attach. to Compl.).[11] The letter accompanying this notice provided plaintiff's "EEOC Charge #" and the notice itself explained, <u>inter alia</u>, that "[t]he EEOC is <u>terminating its processing of this charge</u>." (<u>Id.</u> (emphasis added)).[12]

Defendants assert that "Plaintiff's contentions are belied by the fact that the EEOC never converted Plaintiff's intake

_____

[11] We take the opportunity here to very briefly address the notice of right-to-sue. (<u>See</u> Attach. to Compl.). In our case, plaintiff was issued a so-called "early" notice of right-to-sue, which was granted after "[l]ess than 180 days" had passed since the filing of the charge because the agency "determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge." (<u>Id.</u>). A number of courts, both within this Circuit and beyond, have raised the question of whether such early notices are permissible under Title VII. <u>See</u>, <u>e.g.</u>, <u>Arroyo v. WestLB Admin., Inc.</u>, 213 F.3d 625, *1 (2d Cir. 2000) (citing cases). However, since (1) the Second Circuit has (without deciding the ultimate question) held that the validity of an early right-to-sue notice "is not jurisdictional in nature" (<u>id.</u>), and (2) defendants do not raise this subject in their motion, we take our discussion of it no further. <u>Accord</u> <u>Ibraheem v. Wackenhut Servs., Inc.</u>, 29 F. Supp. 3d 196, 208 n.9 (E.D.N.Y. 2014) ("[E]ven if it were invalid, an early right to sue letter is not jurisdictional in nature."); <u>Kahn v. Objective Solutions, Int'l</u>, 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000) ("The early issuance of a right-to-sue letter . . . would not deprive this Court of jurisdiction.") (citing cases supporting and rejecting this proposition).

[12] Indeed, nowhere in this notice does the EEOC accuse plaintiff of being at all uncooperative with the agency, instead explaining that allowing plaintiff to sue "is warranted given current workloads and the extent of additional information required to complete such an investigation." (Attach. to Compl.).

questionnaire into a formal charge." (Defs.' Reply Mem. 3).[13] Defendants neither explain this statement nor supply case-law standing for the proposition that such a "formal charge" is a necessary prerequisite to litigation. The Supreme Court has explained that "[t]he general practice of EEOC staff members is to prepare a formal charge of discrimination for the complainant to review and to verify, once the allegations have been clarified." Edelman v. Lynchburg College, 535 U.S. 106, 115 n.9 (2002). However, Holowecki and the decisions following its rationale make abundantly clear that even an Intake Questionnaire can be deemed a charge sufficient to permit subsequent litigation, provided filing can be "construed as a request by the employee for the agency to

_____

[13] Defendants also state that plaintiff's arguments in opposition are undermined because "the EEOC never . . . sent a charge to Defendants to enable Defendants to respond accordingly." (Defs.' Reply Mem. 3). Elsewhere, defendants explain that the Notice of Charge of Discrimination -- which defendants themselves provided to the court (see Ex. C to Minnah-Donkoh Decl.) -- was "purportedly mailed" by the EEOC but "never received" by NYU. (Defs.' Mem. 3). We note that this document was indeed addressed to an Associate General Counsel for NYU. (Ex. C to Minnah-Donkoh Decl.). In any event, we fail to see how the EEOC's asserted failure to mail this notice to NYU, or its possible loss in the mail, constitutes a weakness in plaintiff's argument. If anything, it underscores the agency's communication difficulties.

Indeed, when filing their motion papers, defendants apparently had before them an incomplete copy of plaintiff's Intake Questionnaire, which they received directly from the agency in response to their Freedom of Information request. (See Defs.' Reply 2). It was only after receiving the attachment to plaintiff's Affirmation in Opposition did defendants realize the error. (Id.).

take whatever action is necessary to vindicate her rights."
Holowecki, 552 U.S. at 398.


Defendants further argue that plaintiff's Intake Questionnaire
fails as a charge because he did not "specify the protected
class(es) relevant to his discrimination claim." (Defs.' Mem. 9).
Defendants explain that

> [a]lthough Plaintiff indicated in the intake
> questionnaire that he is Black or African American, of
> Egyptian national origin, and was born in 1953, he
> supplied that information simply in response to general
> personal information called for by the intake
> questionnaire. He did not specify whether his claim of
> discrimination or harassment was based on his race,
> national origin and/or age.

(Id. at 10 n.4). This argument is entirely meritless. Once again,
courts look to the charging document "as a whole" when ascertaining
whether a plaintiff met his or her exhaustion requirements.
Holowecki, 552 U.S. at 398. Simply put, "the law does not hold an
employee to the use of magic words to make out a proper
discrimination charge." Maryland v. Sodexho, Inc., 474 F. Supp. 2d
160, 162 (D.D.C. 2007).


Finally, defendants argue that even if the Intake
Questionnaire is deemed a charge generally, plaintiff's retaliation
claim -- included in his complaint (see Compl. p. 3) -- is
unexhausted for failure to assert it to the EEOC. (Defs.' Mem. 11

35

n.5; <u>see</u> <u>also</u> EEOC Intake § 4 (checking the boxes for
discrimination in the form of "Race," "Age," "National Origin," and
"Religion," but not "Retaliation")). While this is a much closer
question than the validity of the Intake Questionnaire as a whole,
we also disagree.

To support their assertion, defendants cite <u>Hewitt v. New York
City Dep't of Health and Mental Hygiene</u>, 535 F. App'x 44, 45 (2d
Cir. 2013). This decision, while providing little or no factual
background, indeed held that the <u>pro</u> <u>se</u> plaintiff had "failed to
administratively exhaust her Title VII retaliation claim by failing
to include that claim in her administrative complaint." (<u>Id.</u>).

We note that the Second Circuit has "recognized, however, that
'claims that were not asserted before the EEOC may be pursued in a
subsequent federal court action if they are "reasonably related" to
those that were filed with the agency.'" <u>Legnani v. Alitalia Linee
Aeree Italiane, S.P.A.</u>, 274 F.3d 683, 686 (2d Cir. 2001) (quoting
<u>Shah v. New York State Dep't of Civil Serv.</u>, 168 F.3d 610, 614 (2d
Cir. 1999)). The Circuit has stated that

> [t]his exception to the exhaustion requirement "is
> essentially an allowance of loose pleading" and is based
> on the recognition that "EEOC charges frequently are
> filled out by employees without the benefit of counsel
> and that their primary purpose is to alert the EEOC to

36

the discrimination that a plaintiff claims [he] is
suffering."

Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (quoting Butts,
990 F.2d at 1402). "A claim is considered reasonably related if the
conduct complained of would fall within the scope of the EEOC
investigation which can reasonably be expected to grow out of the
charge that was made." Fitzgerald v. Henderson, 251 F.3d 435, 359-
60 (2d Cir. 2001).[14]


"In determining whether claims are reasonably related, the
focus should be on the factual allegations made in the [EEOC]
charge itself, describing the discriminatory conduct about which a
plaintiff is grieving." Deravin, 335 F.3d at 201 (internal
quotation omitted). In undertaking this determination, courts are
"guided by the underlying premise that 'it is the substance of the
charge and not its label that controls.'" Chen-Oster v. Goldman,
Sachs & Co., 2012 WL 76915, *3 (S.D.N.Y. Jan. 10, 2012) (quoting
Alonzo v. Chase Manhattan Bank, N.A. 25 F. Supp. 2d 455, 458
(S.D.N.Y. 1998)); see also Mathirampuzha v. Potter, 548 F.3d 70, 76
(2d Cir. 2008). Ultimately, "[t]he central question is whether the
complaint filed with the EEOC gave that agency 'adequate notice to

---

[14] There are two other "types" of claims that are considered
"reasonably related," neither of which is relevant here. See,
e.g., Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003).

investigate discrimination on both bases.'" <u>Williams v. New York City Hous. Auth.</u>, 458 F.3d 67, 70 (2d Cir. 2006) (quoting <u>Deravin</u>, 335 F.3d at 201).

We note that, on the specific facts of their respective cases, courts have utilized these standards to find pled claims of retaliation both reasonably related and not reasonably related to allegations presented to the EEOC in earlier administrative charges. <u>Compare</u>, <u>e.g.</u>, <u>Jenkins v. New York City Trans. Auth.</u>, 646 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2009), <u>with</u> <u>Shepheard v. City of New York</u>, 577 F. Supp. 2d 669, 680 (S.D.N.Y. 2008); <u>see also</u> <u>Brailsford v. Zara USA, Inc.</u>, 2015 WL 1608214, *5 (S.D.N.Y. Apr. 10, 2015).

Again, we accept that the Intake Questionnaire "as a whole" is properly construed as a charge of discrimination. <u>See</u> <u>Holowecki</u>, 552 U.S. at 398. We also acknowledge that inferences of retaliation in plaintiff's submissions to the EEOC are not readily discernable. However, given plaintiff's <u>pro</u> <u>se</u> status and our ability to connect enough dots such that our case presents more than an "EEOC Charge [that] contains no allegations or facts that would lead an investigator to inquire as to any allegedly retaliatory actions,"

see Shepheard, 577 F. Supp. 2d at 680, we do not recommend dismissal on this basis either.

We first observe that -- contrary to defendants' assertion (see Defs.' Reply Mem. 3) -- plaintiff's failure to select "Retaliation" as one of the "reason[s] (basis) for your claim of employment discrimination" (see EEOC Intake § 4) is not dispositive of whether his current claim of retaliation can be viewed as reasonably related to his other allegations. Accord Morris v. David Lerner Assocs., 680 F. Supp. 2d 430, 439 (E.D.N.Y. 2010) (deeming retaliation reasonably related although plaintiff "fail[ed] to check the 'retaliation' box"); Jenkins, 646 F. Supp. 2d at 473 (same).

Plaintiff presented two examples to the EEOC of activity he undertook to protect his rights: the arbitration (see Ex. F to Minnah-Donkoh Decl.) and his complaint to the NYU Equal Opportunity Office. (See EEOC Intake § 15).[15] Admittedly, on its face, the arbitration decision does not appear to constitute an assessment of allegations of discrimination based on plaintiff's membership in one or more protected classes. (See Ex. G to Minnah-Donkoh Decl.).

---

[15] We will below address whether either of these activities is "protected" under the relevant statutes for purposes of pleading a viable retaliation claim. See infra pp. 79-81.

However, plaintiff clearly believed this decision to have been sufficiently erroneous or unfair to trigger his statement to the EEOC that "I WOULD LIKE TO TAKE . . . THE ARBITRATOR TO FED[E]RAL COURT." (Ex. F to  Minnah-Donkoh Decl.).

Accordingly, plaintiff's Intake Questionnaire could fairly have been said to at least strongly imply that he was "force[d] to retir[e] early by [defendants'] us[e] [of] pressure on me at work" (EEOC Intake § 6) because of his efforts to undo the harm assertedly done to him. This inference is strengthened in plaintiff's complaint, which directly connects his claim of retaliation to his statement in the Intake Questionnaire about having been "force[d] to retir[e]." (Id.). In the complaint, plaintiff writes that he was "forced [] to retire due to man[a]g[e]ment retaliation[,] hara[s]sment[,] and ag[g]ravation which forced me to leave the job." (Compl. § II(E)).

As Judge Koeltl has observed, "[w]hile courts have also found such pre-EEOC charge retaliation claims not to be reasonably related to claims explicitly made in the charge, these cases have generally involved charges which were devoid of any reference to a retaliatory motive or any allegation that the plaintiff had engaged in protected activity." Jenkins, 646 F. Supp. 2d 464. On the record

40

before us, we find that plaintiff has at least met this burden and therefore do not recommend dismissal on this basis.

II. <u>Statutes of Limitations</u>

    A. <u>Federal Claims Under Title VII and the ADEA</u>

Under Title VII and the ADEA -- in a state, such as New York, that has an administrative agency to address employment discrimination -- a plaintiff must file a charge with a pertinent state or federal agency within 300 days from the date of the alleged wrongful act. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2); <u>see</u>, <u>e.g.</u>, <u>Ford v. Bernard Fineson Dev. Ctr.</u>, 81 F.3d 304, 307 (2d Cir. 1996). This exhaustion procedure is a precondition to bringing suit under Title VII and the ADEA, <u>see</u> <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982); <u>Kassner v. 2d Ave. Delicatessen Inc.</u>, 496 F.3d 229, 237-38 (2d Cir. 2007), and a failure to abide by that time limitation generally bars a plaintiff from commencing litigation. <u>See</u>, <u>e.g.</u>, <u>Zipes</u>, 455 U.S. at 392-98; <u>Mudholkar v. Univ. of Rochester</u>, 261 F. App'x 320, 322-23 (2d Cir. 2008); <u>Daniels v. Juniper Elbow Co., Inc.</u>, 2015 WL 1514446, *1 (E.D.N.Y. Apr. 2, 2015).

Since plaintiff filed his Intake Questionnaire with the EEOC on February 11, 2014, the limitations cut-off date for his Title VII and ADEA claims is April 17, 2013. Plaintiff alleges failure to promote, unequal terms and conditions of employment, retaliation, hostile work environment/harassment, and constructive discharge. (Compl. § II(A)). For clarity's sake, we begin by discussing this last claim.

Plaintiff proffers November 2013 as the date on which "[i]t is my best recollection that the alleged discriminatory acts occurred." (EEOC Intake § II(B)). Defendants clarify that plaintiff retired on November 13, 2013 (see Ex. I to Minnah-Donkoh Decl.; Def.'s Mem. 13 n.7) and therefore peg plaintiff's constructive discharge to this date. As this falls after April 17, 2013, plaintiff's constructive discharge claim -- premised specifically on the circumstances surrounding his departure from his job -- is not barred by the statute of limitations.[16]

We next address plaintiff's failure-to-promote claim. Presumably, this is a reference to NYU's refusal to hire plaintiff as a First Operator in the new Cogeneration plant, an

---

[16] Defendants fairly acquiesce to this point. (See, e.g., Defs.' Mem. 13).

interpretation with which plaintiff seems to agree. (See Attach. 1 to Affirm. in Opp.). The arbitrator stated that plaintiff was last rejected for this job, after his second interview, on December 13, 2010 (Arb. Opp. 5), a date that falls well outside the limitations period. Accordingly, we recommend that plaintiff's claims under Title VII and the ADEA, premised on failure to promote, be dismissed with prejudice.

We note that plaintiff's allegations premised on this event are not saved by the so-called "continuing-violation doctrine." This principle, insofar as applied to claims under Title VII and related federal statutes, was traditionally viewed as applicable if a plaintiff had experienced a broadly construed continuous practice and policy of discrimination, in which case "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks and citations omitted); see also Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992). This principle has since been limited by the Supreme Court's decision in National R.R. Corp. v. Morgan, 536 U.S. 101 (2002), in which the Court held that "discrete discriminatory acts" -- including, for example, refusals to hire, failure to promote, or terminations -- "are not actionable if time barred,

43

even when they are related to acts alleged in timely filed charges." Id. at 113-14. Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Id.

In practice, then, the continuing-violation rule applies only to claims amounting to assertions of hostile-work environment or similar claims that "cannot be said to occur on any particular day" but rather are the product of events that take place "over a series of days or perhaps years." Id. at 115; see, e.g., Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 155-58 (2d Cir. 2012) ("Morgan established that an employer's failure to promote is by its very nature a discrete act . . . which [when it] fall[s] outside the limitations period, cannot be brought within it".); Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 211-12 (E.D.N.Y. 2014); Schwartz v. New York State Ins. Fund, 2012 WL 5587604, *6 (S.D.N.Y. Aug. 28, 2012).

In this case, plaintiff's failure-to-promote claim concerns a discrete action that, despite his seeming assertion that it is connected to a pattern of "retaliation[,] hara[s]sment[,] and ag[g]ravation" (Compl. § II(E)), does not result in a widening of the limitations period. "Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even

44

when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." <u>Chin</u>, 685 F.3d at 157 (citing cases). In other words, allegations of "separate instances of alleged unlawful conduct, occurring at different times and under different circumstances, without a non-conclusory factual connection -- rather than a common policy under which all the actions were carried out" -- are insufficient to invoke the continuing-violation doctrine. <u>Jackson v. New York State</u>, 523 F. App'x 67, 69 (2d Cir. 2013); <u>cf. Gutierrez v. City of New York</u>, 756 F. Supp. 2d 491, 500 n.2 (S.D.N.Y. 2010) ("The doctrine of continuing violation is not popular with all courts in our district."); <u>Falinski v. Kuntz</u>, 38 F. Supp. 2d 250, 257 (S.D.N.Y. 1999) ("The courts of this Circuit have generally been loath to invoke the continuing violation doctrine and will apply it only upon a showing of 'compelling circumstances.'").

We turn now to plaintiff's claim of unequal terms and conditions of employment. His only factual assertion to this effect is that "N.Y.U. . . . [did] not pay[] equal wages for 6 month[s] with overtime the new salary for 1st operator." (Compl. § II(E)). The same analysis applies here as it did to plaintiff's claim of failure to promote. Plaintiff seemingly is referring to the six months he spent at least nominally performing the job of First

Operator without being paid the higher salary. (Arb. Opp. 8). This period stretched from January 1, 2011 to June 6, 2011 (id), a time-frame that, like NYU's decision to withhold the First Operator job from plaintiff, falls beyond the limitations period. Also, like the failure to promote, inadequate wages over a discrete period of time prior to the start of the limitations period does not generally trigger the continuing-violation doctrine. See, e.g., Bhaduri v. Summit Sec. Servs., Inc., 2006 WL 2290766, *6 n.5 (S.D.N.Y. Aug. 8, 2006); Sundaram v. Brookhaven Nat. Labs., 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006).

    Plaintiff also alleges that he suffered from "too much pressure and har[as]sment" and "man[a]g[e]ment retaliation[,] hara[s]sment[,] and ag[g]ravation." (Compl. p. 3). We will discuss below the inadequacy of these conclusory allegations under Rule 12 pleading standards. See infra pp. 59-85. For now, we merely note that, to the extent that plaintiff is alleging facts independent of his claim for constructive discharge, we cannot discern whether those facts took place before or after the start of the limitations period. If plaintiff's claims concern a hostile work environment for the period running from April 17, 2013 (the start of the limitations period) through November 13, 2013 (plaintiff's retirement from NYU), such allegations would not be not barred by

the applicable limitations period. If there exist pre-April 17, 2013 incidents that plaintiff would describe as harassment, the application of the continuing-violation doctrine would depend on what facts plaintiff includes in any amended complaint. Generally, "hostile work environment claims typically merit application of the continuing violations doctrine because they 'cannot be said to occur on any particular day,' but instead occur 'over a series of days or perhaps years.'" Schwartz, 2012 WL 5587604 at *6 (quoting Morgan, 536 U.S. at 115); see also Szuszkiewicz v. JPMorgan Chase Bank, 12 F. Supp. 3d 330, 338 (E.D.N.Y. 2014) ("The 'continuing violation' doctrine extends the 300 day filing period in cases alleging a hostile work environment.").

At present, however, we cannot determine whether plaintiff's allegations of harassment and aggravation are of the type that "cannot be said to occur on any particular day" and thus plausibly trigger the continuing-violation doctrine. If our ultimate recommendation is adopted and plaintiff's hostile-work-environment claims are dismissed without prejudice to repleading -- to make out a claim for hostile work environment under the federal statutes that includes allegations from before April 17, 2013 -- he will need to provide some showing reflecting that this is not an

47

allegation of a collection of "discrete discriminatory acts."
Morgan, 536 U.S. at 113-14.


Our determination with respect to plaintiff's retaliation
claim is much the same. As a general matter, allegations of
retaliation are not afforded the benefit of the continuing-
violation doctrine. See, e.g., Kalola v. Int'l Bus. Machines, 2015
WL 861718, *9 n.14 (S.D.N.Y. Feb. 3, 2015) ("Unlike discrimination
and retaliation claims, a hostile work environment claim triggers
the continuing violation doctrine."). However, like vague
allegations of harassment, the timeliness of retaliation claims
much depends on which conceptual bucket the attendant facts fall
within. As helpfully summarized by Judge Bianco in the Eastern
District,

> To determine whether a claim was timely filed, incidents
> of . . . retaliation must be categorized as either
> discrete acts or continuing violations. A claim based
> upon a discrete act of . . . retaliation, such as
> termination, failure to promote, denial of transfer, or
> refusal to hire, is time-barred if the discrete act
> occurred outside the applicable limitations period. This
> holds true even when [a discrete act is] related to the
> acts alleged in timely filed charges. By contrast, a
> claim based upon . . . retaliation occurring over a
> series of days or perhaps years, such as a hostile work
> environment, is timely if even one contributing act
> occurred within the limitations period.

Johnson v. Cnty. of Nassau, 2014 WL 4700025, *10 (E.D.N.Y. Sept.
22, 2014) (internal quotations omitted); accord Clark v. Jewish

48

Childcare Ass'n, Inc., __ F. Supp. 3d __, __, 2015 WL 1452134, *15
(S.D.N.Y. Mar. 31, 2015). We cannot at this stage say how
plaintiff's allegations of retaliation are best categorized or even
precisely what actions taken against plaintiff are ones that he
believes were retaliatory. As we also eventually recommend
dismissal of this claim without prejudice, the determination of
whether and to what extent plaintiff's claims for retaliation are
barred is best left for an assessment of any amended pleadings.


   B. Claims Under the NYSHRL and the NYCHRL


     The statutes of limitations under the NYSHRL and the NYCHRL
are both three years. N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code §
8-502(d). However, while the Second Circuit has yet to opine on the
issue, courts in this Circuit generally hold that this three-year
limitations period "is tolled for the period between the filing of
an EEOC charge and the issue by the EEOC of a right-to-sue letter."
DeNigris v. New York City Health & Hosp. Corp., 861 F. Supp. 2d
185, 192 (S.D.N.Y. 2012) (Batts, D.J.); see also Otegbade v. New
York City Admin for Children Servs., 2015 WL 851631, *4 n.7
(S.D.N.Y. Feb. 27, 2015) (Failla, D.J.); Allen v. New York City
Dep't of Envtl. Prot., 51 F. Supp. 3d 504, 511 (S.D.N.Y. 2014)
(Karas, D.J.); Ugactz v. United Parcel Serv., Inc., 2013 WL

1232355, *6 (E.D.N.Y.  Mar. 26, 2013); <u>Capobianco v. Sandow Media Corp.</u>, 2012 WL 4561761, *4 (S.D.N.Y. Sept. 29, 2012) (Preska, C.J.); <u>Wilson v. New York City Police Dep't</u>, 2011 WL 1215031, *14 (S.D.N.Y. Feb. 4, 2011) (Pitman, M.J.); <u>Butler v. New York Health & Racquet Club</u>, 768 F. Supp. 2d 516, 536 (S.D.N.Y. 2011) (Maas, M.J.); <u>Siddiqi v. New York City Health & Hosps. Corp.</u>, 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008) (McMahon, D.J.); <u>Lee v. Overseas Shipholding Grp., Inc.</u>, 2001 WL 849747, *8 (S.D.N.Y. 2001) (Cote, D.J.).[17]

The standards governing application of the limitations defense under the NYSHRL -- including those related to the continuing-violation doctrine -- parallel those applicable to Title VII. <u>See</u>, <u>e.g.</u>, <u>E.E.O.C. v. Bloomberg L.P.</u>, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013); <u>Campbell v. Cellco P'ship</u>, 860 F. Supp. 2d 284, 296 (S.D.N.Y. 2012); <u>Staff v. Pall Corp.</u>, 233 F. Supp. 2d 516,

---

[17] We note that there is significantly more federal authority on this issue than there are state court decisions standing for the same. The very few state decisions that accord with this tolling rule, <u>see</u>, <u>e.g.</u>, <u>Leavy v. New York City Trans. Auth.</u>, 11 Misc. 3d 1052(A), *5, 814 N.Y.S.2d 891, *5 (Sup. Ct. Kings Cnty. Jan. 27, 2006) -- along with a number of the federal decisions cited above, <u>see</u>, <u>e.g.</u>, <u>Otegbade</u>, 2015 WL 851631 at *4 n.7; <u>Saddiqi</u>, 572 F. Supp. 2d at 373; <u>Lee</u>, 2001 WL 849747 at *8 -- are rooted in a single New York appellate decision, <u>Martinez-Tolentino v. Buffalo State College</u>, 277 A.D.2d 899, 899, 715 N.Y.S.2d 554, 555 (4th Dep't 2000). Based on that state-court precedent, we do not deviate from the line of federal decisions to the same effect.

527–28 (S.D.N.Y. 2002), aff'd, 76 F. App'x 366 (2d Cir. 2003). The analysis differs slightly, however, under the NYCHRL.


In 2005, New York City enacted an amendment to the NYCHRL titled the Restoration Act, legislation that was intended to require a more liberal approach to the City's anti-discrimination statute than had been adopted in interpreting Title VII and the NYSHRL. See Williams v. New York City Hous. Auth., 61 A.D.3d 62, 72–73 & n.14, 872 N.Y.S.2d 27, 35 & n.14 (1st Dep't 2009). The impact of that legislation includes a rejection, in effect, of Morgan's narrowing of the continuing-violation rule. Id.; accord Sotomayor v. City of New York, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012). Under New York precedent, the Restoration Act has the effect of incorporating pre-Morgan standards developed in the federal courts, and thus "discrete acts can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice or policy.'" Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) (citing Williams, 61 A.D.3d at 72, 872 N.Y.S.2d at 35 & quoting Fitzgerald, 251 F.3d at 359). Under this approach, if a plaintiff experienced a continuous policy or practice of discrimination, the continuing-violation doctrine delays the commencement of the statute-of-limitations

period until the occurrence of the last discriminatory act in furtherance of that discriminatory practice. Id.; see also Harris, 2013 WL 5425336 *28; Morgan v. NYS Attorney Gen. Office, 2013 WL 491525, *12 (S.D.N.Y. Feb. 8, 2013).[18]

Plaintiff filed his complaint in this court on October 20, 2014. Absent tolling, claims that arose prior to October 20, 2011 would be barred. Plaintiff, however, filed his complaint with the EEOC on February 11, 2014, and the EEOC issued the right-to-sue letter to plaintiff on August 1, 2014. Under the prevailing case-law, the NYSHRL and NYCHRL statutes of limitations were tolled during this period of 172 days. Thus, barring the applicability of the continuing-violation doctrine, plaintiff's state and city claims that arose prior to May 1, 2011 are barred.

---

[18] We acknowledge the handful of cases in this Circuit that have held, subsequent to the passage of the Restoration Act and in contrast to the clear thrust of attendant case-law, that Morgan applies equally to NYSHRL and NYCHRL claims. See, e.g., Gandarilla v. Sanchez, 2012 WL 3525607, *6 (S.D.N.Y. Aug. 15, 2012) ("The continuing violation doctrine of Morgan applies to claims brought under the NYSHRL and NYCHRL."); Bermudez v. City of New York, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011); Lu v. Chase Inv. Servs., Corp., 2009 WL 4670922, *7 (E.D.N.Y. Dec. 9, 2009). However, given the fact that these cases cite only to pre-Restoration Act decisions and run contrary to the overwhelming authority on the issue, we find them unpersuasive.

First, we again easily place plaintiff's constructive-discharge claim within the limitations period. Plaintiff retired -- or was forced out -- on November 13, 2013, and thus his claims emanating from this event are not time-barred under either the NYSHRL or the NYCHRL. The remaining claims, however, require separate discussion under each of these laws.

Under the NYSHRL, plaintiff's claim of failure to promote, which stems from the December 13, 2010 decision not to hire him as a First Operator in the new plant, is time-barred under the state law, as it was under the federal statutes. We therefore recommend that this claim be dismissed with prejudice.

With respect to plaintiff's allegations of unequal terms and conditions of employment -- seemingly premised on defendants' refusal to pay him the salary of First Operator while he performed some or all of the functions of the job during the first half of 2011 -- we recommend that the portion of this claim that relates to the months of January through April be dismissed with prejudice as time-barred under the statute of limitations. The discriminatory payment of wages, even over some well-defined period of time, does not trigger application of the continuing-violation doctrine "because '[e]ach week's paycheck that deliver[s] less' to a member

of a protected class 'is a wrong actionable under Title IV'" and related statutes. <u>Barrett v. Forest Laboratories, Inc.</u>, 39 F. Supp. 3d 407, 459 (S.D.N.Y. 2014) (quoting <u>Morgan</u>, 536 U.S. at 112); <u>accord</u> <u>Dunn v. URS Corp.</u>, 2015 WL 220990, *6 (S.D.N.Y. Jan. 12, 2015); <u>Bhaduri v. Summit Sec. Servs.</u>, 2006 WL 2290766, *7 n.5 (S.D.N.Y. Aug. 8, 2006). The remainder of the period during which plaintiff was allegedly not paid the higher wages, that is, during the months of May and June 2011, fall within the limitations period and are accordingly not barred under the NYSHRL.

Additionally, although the cutoff of the NYSHRL limitations period is earlier than those under Title VII and the ADEA, plaintiff's claims of retaliation and hostile work environment/harassment are subject to the same analysis as under the federal statutes. Other than in conclusory fashion, plaintiff does not explain how he was retaliated against, harassed, or "ag[g]ravat[ed]." (Compl. p. 3). In an amended pleading, plaintiff may reveal that his claims fall within the NYSHRL limitations period -- or not -- and he may make a showing sufficient to trigger the continuing-violation doctrine -- or not. Given our recommendation of dismissal without prejudice for these claims, it will be plaintiff's burden to make a showing that he has complied with the timing requirements under state law.

Turning now to plaintiff's claims under the NYCHRL, we first note that, notwithstanding the liberality of the continuing-violation doctrine under City law, plaintiff's allegations of retaliation and hostile work environment/harassment are no more complete for purposes of this statute than under the NYSHRL or the federal laws. Accordingly, we leave aside the question, for now, of whether plaintiff's claims under these theories would be barred under City law. It is conceivable, as under federal and state law, that plaintiff may be able to make a viable, timely claim (as a function of the facts either having taken place subsequent to the start of the limitations period or showing a continuing-violation under pre-Morgan jurisprudence).

It is plaintiff's allegations of failure to promote and unequal terms and conditions of employment that test the doctrinal distinctions between the NYSHRL and the NYCHRL. Under the more liberal, pre-Morgan doctrine of continuing violation -- still utilized by courts applying the NYCHRL -- "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of" a "continuous practice and policy of discrimination." Fitzgerald, 251 F.3d at 359 (internal quotations omitted). Accordingly, "[t]ime-barred discrete acts can be considered timely 'where specific and related instances of

55

discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" Dimitracopoulos, 26 F. Supp. 3d at 212.[19]

The events underlying the claim for unequal terms and conditions of employment took place from January to June 2011, and thus the claim is, in part, outside the statute of limitations. We note that pre-Morgan case-law on the subject of whether payment of deficient wages can constitute a continuing violation is somewhat discordant. Compare, e.g., Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 119 (2d Cir. 1997) ("[A] cause of action based on receipt of a paycheck prior to the limitations period is untimely and recovery for pay differentials prior to the limitations period is barred irrespective of subsequent, similar timely violations."), with Brennan v. City of White Plains, 1998 WL 75692, *6-10 (S.D.N.Y. Feb. 20, 1998) (distinguishing Pollis on its facts and holding that such claims are "sufficient . . . to state a claim of continuing violation"). However, given the liberality of the NYCHRL, especially in light of the Restoration Act, a failure to

---

[19] As with the NYSHRL, plaintiff's claim of unequal terms and conditions of employment -- premised on his having received a lower wage for January through June 2011 -- relies on events that took place partially within the limitations period. Accordingly, plaintiff's allegations on this subject are not barred to the extent the relevant events occurred in May or June 2011.

pay required wages over a discrete period of time is likely to be considered a "continuous practice and policy of discrimination" that delays the commencement of the limitations period "until the last discriminatory act in furtherance of it." Fitzgerald, 251 F.3d at 359. Plaintiff's claim for unequal terms and conditions of employment under the NYCHRL, therefore, is not barred by the applicable statute of limitations.

As for plaintiff's NYCHRL claim of failure to promote -- that is, NYU's refusal to hire plaintiff for the First Operator position -- the pertinent events took place by December 13, 2010, well outside the limitations period. Nonetheless, the events in question may possibly represent an illustration of the kinds of "discrete discriminatory acts" undercut by the Supreme Court in Morgan, see 536 U.S. at 113-14, but still viable under the NYCHRL. See, e.g., Harris, 2013 WL 3487032 at *28 (contrasting claims of failure to promote under the NYCHRL and the federal and state statutes). Still, "[e]ven under the more lenient NYCHRL, the . . . failure to promote claim" must be "connected to claims of actionable conduct that occurred during the limitations period." Campbell, 860 F. Supp. 2d at 299. Plaintiff provides us too little, at this stage, to determine whether his claim for failure to promote can be so connected to his unbarred claims. Without some additional

57

allegations, plaintiff's claim is beyond the limitations period and, as under Title VII, the ADEA, and NYSHRL, barred by the statute of limitations. Accordingly, we recommend dismissal of this claim without prejudice to repleading (whereas we recommend dismissal with prejudice under those other statutes).

In sum, the impact of defendants' limitations defense on plaintiff's claims is as follows. Plaintiff presents five categories of claims: (1) failure to promote, premised on the December 13, 2010 refusal of NYU to hire him as First Operator, (2) unequal terms and conditions of employment, premised on defendants' refusal to pay him the higher First Operator wage from January through June 2011, (3) retaliation, (4) hostile work environment/harassment, and (5) constructive discharge, premised on his retirement (or forced departure) from NYU on November 13, 2013.

Plaintiff's claims for failure to promote are barred under Title VII, the ADEA, and the NYSHRL and should be dismissed with prejudice. Plaintiff's claims for unequal terms and conditions of employment are entirely barred under Title VII and the ADEA and should also be dismissed with prejudice. Plaintiff's equivalent claim under the NYSHRL is barred only for the period prior to May 1, 2011. For the period subsequent to that date, plaintiff's claim

for unequal terms and conditions of employment under the NYSHRL is not barred. Additionally, this claim is not barred at all -- despite the limitations period -- under the NYCHRL. Also, plaintiff's claims for constructive discharge are not barred under any of the relevant statutes.

All of plaintiff's other claims, however -- for retaliation and hostile work environment/harassment under all four statutes and for failure to promote under the NYCHRL -- may or may not be barred under the relevant statutes of limitations. We cannot make a determination one way or the other based on plaintiff's current pleading, and, as we ultimately recommend dismissal of these claims without prejudice to repleading under Rule 12, we say the same with respect to their status under the statutes of limitations: Plaintiff should be permitted to amend his complaint and given the opportunity to show why these claims are not barred by the statutes of limitations.

III. <u>The Legal Adequacy of Plaintiff's Claims</u>

Finally, defendants argue that plaintiff fails to allege sufficient facts to state a plausible claim under Rule 12(b)(6). (Defs.' Mem. 14-19).

59

We first summarize the standards that apply to motions to dismiss for failure to state a claim. We then address defendants' substantive challenges to the allegations of the complaint. In so doing, we again note that we read plaintiff's pleading in conjunction with his affirmation in opposition and certain other documents proffered to us in the course of motion briefing and read these submissions in whichever light is most favorable to plaintiff, see, e.g., Triestman, 470 F.3d at 474-76, a liberality that applies "with particular stringency to complaints of civil rights violations." Phillip v. Univ. of Rochester, 316 F.3d 291, 293-94 (2d Cir. 2003).

### A. Rule 12(b)(6) Criteria

We first address the standards applicable to the required 12(b)(6) analysis. When the court assesses such a motion, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord, e.g., Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006). In assessing such a motion, the court must assume the truth of the

60

well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., In re Kingate Mgmt. Ltd. Litig., __ F.3d __, __ n.11, 2015 WL 1839874, *4 n.11 (2d Cir. Apr. 23, 2015); Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 678-79), or "legal conclusions couched as factual allegations." Starr, 592 F.3d at 321 (quoting Port Dock & Stone Corp. v. Old Castle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007)).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Leibowitz v. Cornell Univ., 445 F.3d 586, 590 (2d Cir. 2006) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Supreme Court has since rejected this formulation, however, and hence a complaint is now subject to dismissal unless its factual allegations, if credited, make the claim "plausible." See Iqbal, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-

pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560-61 (2007). The court thus must look to the well-pled factual allegations and determine whether, if true, those allegations would permit a reasonable inference that the defendant is liable. See, e.g., Iqbal, 556 U.S. at 677-79. While this does not require a party to plead "detailed factual allegations" to survive a motion to dismiss, Starr, 592 F.3d at 321 (quoting Twombly, 550 U.S. at 555), it does require that "'the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 678). Thus, "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. Iqbal, 556 U.S. at 678.

In short, the pleading must do more than "tender[] naked assertion[s] devoid of further factual enhancement," id. (internal quotation omitted), and in doing so must "'raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555). "This standard 'is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"

62

Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 678). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (internal quotations omitted). Finally, we note that the "plausibility" standard articulated in Twombly and Iqbal applies to the pleadings of pro se plaintiffs as well as to those of represented litigants. See, e.g., Teichmann v. New York, 769 F.3d 821, 825 (2d Cir. 2014); see also Muhammad v. Juicy Couture/Liz Claibourne, Inc., 2010 WL 4032735, *2-3 (S.D.N.Y. July 30, 2010).[20]


### B. Claims of Discrimination Under Title VII and the ADEA


#### (i). Legal Standards


Under Title VII, it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

---

[20] Rules 8 and 12(b)(6) extend to claims under state as well as federal law. See, e.g., Warmann v. Excel Dentistry, 2014 WL 846723, *2 (S.D.N.Y. Feb. 25, 2014) (applying Rule 12(b)(6) standards to NYSHRL & NYCHRL claims); Harris v. NYU Langone Med. Ctr., 2014 WL 3487032 (S.D.N.Y. July 9, 2013) (applying Rules 8, 12(b)(6) & 15 to NYSHRL & NYCHRL claims). Necessarily, then, so does the plausibility requirement.

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA forbids employers to "discharge . . . or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).[21]

Employment discrimination claims asserted under Title VII and the ADEA are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Abrams v. Dep't of Public Safety, 764 F.3d 244, 251 (2d Cir. 2014); Chapotkat v. Cnty. of Rockland, __ F. App'x __, 2015 WL 1449361, *1 (2d Cir. Apr. 1, 2015) (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)) ("Following the Supreme Court's decision in Gross, we continue to address ADEA claims under the McDonnell Douglas burden-shifting framework.").

Under the McDonnell Douglas framework, the initial burden is on the plaintiff to establish a prima facie case of discrimination. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-

---

[21] The ADEA protects only those persons who are forty years of age or older. 29 U.S.C. § 631.

53 (1981)). To meet that burden, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination. Hicks, 509 U.S. at 506; Wright v. City of Syracuse, __ F. App'x __, 2015 WL 1727169, *2 (2d Cir. Apr. 16, 2015); Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

In 2002 the Supreme Court held, however, that the prima facie case requirement under McDonnell Douglas is an evidentiary standard, not a pleading requirement. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-12 (2002); accord Boykin v. KeyCorp, 521 F.3d 202, 212 (2d Cir. 2008). At the pleading stage, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," which will "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz, 534 U.S at 512 (quoting Conley, 355 U.S. at 47). That said, however, the High Court's subsequent decisions in Twombly and Iqbal require that the complaint contain such specific contextually-dictated factual allegations as will permit a "reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at

65

678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Turkmen v. Ashcroft, 589 F.3d 542, 546 (2d Cir. 2009) (per curiam) (quoting Iqbal, 556 U.S. at 678); see also E.E.O.C. v. Port Auth. of New York and New Jersey, 768 F.3d 247, 254 (2d Cir. 2014).

In short, "[a]n employee bringing a Title VII [or ADEA] discrimination claim need not allege facts that make out a prima facie case under McDonnell Douglas, but the complaint must nevertheless set forth allegations that support a plausible claim of discrimination." Brodt v. City of New York, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014); see also Brown v. Daikin Am. Inc., 756 F.3d 219, 228 n.10 (2d Cir. 2014) ("Courts in our Circuit have reconciled Swierkiewicz, Twombly, and Iqbal by concluding that, to survive a motion to dismiss, a Title VII plaintiff's complaint must be facially plausible and allege sufficient facts to give the defendant fair notice of the basis for the claim."). This effort "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." Port Auth., 768 F.3d at 254; accord Giambattista v. Am. Airlines, Inc., 584 F. App'x 23, 24 (2d Cir. 2014).

For the court to deem a set of factual allegations plausible, the plaintiff must allege facts that allow the court, in substance, to infer the essential elements of his case. See, e.g., Knight v. State Univ. of New York at Stony Brook, 2014 WL 4639100, *5 (E.D.N.Y. Sept. 16, 2014); Harris v. NYU Langone Med. Ctr., 2013 WL 3487032, *15 (S.D.N.Y. July 9, 2013); Romaine v. New York City Coll. of Tech. of the City Univ. of New York, 2012 WL 1980371, *2 (E.D.N.Y. June 1, 2012) ("The elements of a prima facie discrimination claim are . . . relevant to the determination of whether a complaint provides a defendant with fair notice and contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quoting Chacko v. Worldwide Flight Servs., Inc., 2010 WL 424025, *3 (E.D.N.Y. Feb. 3, 2010)).

(ii). Assessment of Plaintiff's Claims

As set forth below, plaintiff sufficiently pleads facts under the first two elements of the McDonnell Douglas framework. However, he fails to assert nonconclusory allegations that he was subject to one or more adverse employment actions and that those actions were the result of discriminatory animus. We therefore recommend that -- to the extent not barred by the applicable statute of limitations

-- his employment-related Title VII and ADEA claims be dismissed without prejudice.

First, plaintiff sufficiently alleges that he is a member of one or more protected groups, that is, he is "African," "dark," "Musl[i]m," and "Arab." (Compl. p. 3). Also, plaintiff was born in 1953 and thus falls within the ADEA's protective ambit. (<u>Id.</u>; <u>see also</u> EEOC Intake p. 1). Second, while NYU appears to maintain the same position with respect to this motion as it did at plaintiff's arbitration -- that the new First Operator position was different from the old one and that plaintiff was not qualified to serve in this capacity in the Cogeneration plant -- the second element of the relevant test only demands that the plaintiff be "competent to perform the job." <u>Mario v. P & C Food Markets, Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002). The Second Circuit has stated that "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 92 (2d Cir. 2001); <u>see also</u> <u>Kaboggozamusoke v. Rye Town Hilton Hotel</u>, 370 F. App'x 246, 248 n.1 (2d Cir. 2010); <u>Jeffrey v. Montefiore Med. Ctr.</u>, 2013 WL 5434635, *18 (S.D.N.Y. Sept. 27, 2013). Plaintiff had been employed as a First Operator since 2004 and served as an engineer for NYU since as early as 1990. (EEOC

68

Intake p. 1; Arb. Op. 2, 7). Moreover, whatever the differences between the new and old plants, NYU apparently saw fit to employ plaintiff in the capacity of First Operator in the new plant for six months in 2011. (Arb. Opp. 8). While this may not, and indeed did not, satisfy the employer, plaintiff demonstrates at least the basic eligibility required to plead this element under McDonnell Douglas, notwithstanding plaintiff's test scores and interview performance during the hiring process.

Third, however, the proffered facts fail to reflect that plaintiff was the subject of any adverse employment actions with respect to his unbarred federal claims. An adverse employment action is generally any "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation omitted); accord, e.g., Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). Examples of materially adverse actions vary and can be context-dependent, but generally include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting Terry v. Ashcroft, 336 F.3d

69

128, 138 (2d Cir. 2003)); see also Louis Chung v. City Univ. of New York, __ F. App'x __, 2015 WL 1428192, *2 (2d Cir. Mar. 31, 2015).

The remaining, unbarred claims under Title VII and the ADEA concern plaintiff's allegations of retaliation -- which we will address separately below, see infra pp. 77-84 -- hostile work environment/harassment, and constructive discharge. Plaintiff proffers nothing but conclusory allegations of harassment. He writes only that he suffered "too much pressure and har[a]s[s]ment" and "har[a]s[s]ment and ag[g]ravation." (Compl. p. 3). This was not sufficient for purposes of discerning whether his claims stem from events within the limitations period, and it is similarly lacking for purposes of gleaning whether or not his claims constitute something more than "trivial harms," that is, "those petty slights or minor annoyances that often take place at work and that all employees experience," which are not materially adverse or actionable under Title VII or the ADEA. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); see also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2012).

Moreover, plaintiff fails to allege a plausible claim for constructive discharge. "As [the Second Circuit] has several times

70

observed, '[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.'" Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004) (quoting Terry, 336 F.3d at 151-52). An inquiry into claims of constructive discharge focuses on "the employer's intentional conduct and the intolerable level of the work conditions." Petrosino, 385 F.3d at 229-30 (citing cases).

While plaintiff indeed retired in November 2013, he alleges only that he was "force[d] to retir[e] early by [NYU's] using pressure on me at work." (EEOC Intake § 6; see also Compl. p. 3). This statement is entirely conclusory and lacks even a scintilla of evidence suggestive of defendants' conduct or the degree to which plaintiff experienced intolerable conditions.

Accordingly, we recommend that plaintiff's claims of hostile work environment/harassment and constructive discharge under Title VII and the ADEA be dismissed without prejudice.[22]

---

[22] We note also that plaintiff does not allege any facts that suggest -- plausibly or otherwise -- that discriminatory animus of any kind was a motivating factor in either of the alleged "adverse" actions. Accordingly, plaintiff's claims fail under this prong of McDonnell Douglas as well.

71

C. <u>Claims of Discrimination Under the NYSHRL</u>

Plaintiff pursues parallel claims of discrimination under the NYSHRL. Those of his NYSHRL claims that survive the statute of limitations defense are hostile work environment/harassment, constructive discharge, unequal terms and conditions of employment after May 1, 2011, and retaliation.[23] These state-law claims are governed by the same standards as the equivalent federal claims, that is, the <u>McDonnell Douglas</u> burden-shifting framework. <u>See</u>, <u>e.g.</u>, <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 843 (2d Cir. 2013); <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 125 (2d Cir. 2013). For reasons specified in recommending dismissal of plaintiff's claims of hostile work environment/harassment and constructive discharge under federal law, we recommend plaintiff's equivalent state-law claims be similarly dismissed without prejudice.

As for plaintiff's state-law claim of unequal pay, as noted, <u>see</u> <u>supra</u> pp. 53-54, a portion of that claim survives under the NYSHRL's statute of limitations, whereas the entire claim is barred under Title VII and the ADEA. We therefore address this claim -- that is, plaintiff's allegations of unequal pay extending from May

---

[23] As with plaintiff's allegations of retaliation under federal law, state-law retaliation claims with be discussed separately below. <u>See</u> <u>infra</u> pp. 77-84.

1 (the limitations-period cutoff) through June 2011 -- under McDonnell Douglas.

Again, plaintiff meets his burden of pleading that he belongs to a protected group and is qualified for the relevant position. See supra pp. 68-69. Plaintiff also sufficiently alleges that he suffered an adverse employment action. For purposes of the minimal burden required to state a claim, plaintiff asserts something akin to a "demotion evidenced by a decrease in wage or salary," Joseph, 465 F. 3d at 90, since he complains of not having received the First Operator wage when he allegedly performed the duties attendant to that job. (See Compl. p. 3; Arb. Op. 8). Stating a claim for unequal terms and conditions of employment generally requires some showing "that there were other similarly situated employees, outside the protected class, who engaged in conduct substantially similar to that of plaintiff but received preferential treatment." Vanhorne v. N.Y.C. Transit Auth., 273 F. Supp. 2d 209, 216 (E.D.N.Y. 2003); accord Smith v. St. Luke's Roosevelt Hosp., 2009 WL 2447754, *22 (S.D.N.Y. 2009). Although plaintiff does not explicitly set forth facts describing the wage conditions of his fellow employees, it is a simple enough task to recognize the inferences that he is asking the court to make -- that for some period of time he performed the duties of First

Operator, but was not paid the wage associated with that position, while others who performed this work and who had the title of First Operator bestowed upon them by NYU did earn this wage and the attendant overtime pay.[24]

Nevertheless, plaintiff's claim, as pled, fails for lack of any indication that discriminatory animus was a motivating factor in the wages that he received during this period. He provides no examples of "the employer's criticism of the plaintiff's performance in ethnically [or age-related] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's

---

[24] Plaintiff mentions not having received "equal wages for 6 month[s,] with overtime[,] the new salary for 1st Operator." (Compl. p. 3 (emphasis added)). From context and given the substance of the arbitration decision, it does not appear likely that plaintiff is alleging that he received no overtime for work performed in excess of the regular work-week. Rather, plaintiff seems to be alleging that -- while he received wages and overtime reflective of the salary of an Outside Plant Maintenance Mechanic -- he did not receive that compensation under the pay scale of a First Operator. In any event, we can discern no viable claim for, say, non-payment of overtime under the Fair Labor Standards Act ("FLSA"). As the Second Circuit has recently clarified, "in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 114 (2d Cir. 2013). Merely using the word "overtime" in a complaint otherwise devoid of related facts does not state an FLSA claim.

discharge [or other adverse employment actions]," <u>Leibowitz v.
Cornell Univ.</u>, 584 F.3d 487, 502 (2d Cir. 2009) (quoting <u>Chambers
v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994) (internal
citations omitted)), any one of which may have dictated a different
outcome here. Absent evidence even remotely suggestive of an
inference of prohibited animus, plaintiff's claims for unequal
terms and conditions of employment under state law fail as well. We
also recommend that this claim be dismissed without prejudice.


D. <u>Claims of Discrimination Under the NYCHRL</u>


As for plaintiff's claims under the NYCHRL, that statute
embodies, in certain respects, a more lenient standard than Title
VII. <u>See</u>, <u>e.g.</u>, <u>Mihalik v. Credit Agricole Cheuvreux</u>, 715 F.3d 102,
108-09 (2d Cir. 2013); <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582
F.3d 268, 277-79 (2d Cir. 2009) (discussing impact of NYC
Restoration Act & quoting <u>Williams</u>, 61 A.D.3d at 66-69, 872
N.Y.S.2d at 31). Specifically, in lieu of the interpretation of the
adverse-employment-action requirement embodied in Title VII and
other federal statutes, a plaintiff seeking to sustain a claim of
employment discrimination under the NYCHRL "must only show that she
was treated differently from others in a way that was more than
trivial, insubstantial, or petty." <u>Dimitracopoulos</u>, 26 F. Supp. 3d

75

216; see, e.g., Gorokhovsky v. New York City Housing Auth., 552 F. App'x 100, 102 (2d Cir. 2014) ("To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive."); Williams v. Regus Mgt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011). However, notwithstanding this distinction, the NYCHRL "still requires a showing of some evidence from which discrimination can be inferred." Ben-Levy v. Bloomberg LLP, 518 F. App'x 17, 20 (2d Cir. 2013).

In this case, the variations from federal standards that are embodied in the NYCHRL in the wake of the Restoration Act do not dictate a different result from our conclusions regarding plaintiff's claims under Title VII, the ADEA, and the NYSHRL. Plaintiff's submissions are entirely silent as to facts suggestive of animus of any kind. We therefore recommend that plaintiff's claims under City law be dismissed as well, with the caveat that -- given the differences in the NYCHRL's approach to the continuing-violation doctrine -- our recommendation is that all of plaintiff's City-law discrimination claims be dismissed without prejudice.

E. Claims for Retaliation

Allegations of retaliation under Title VII, the ADEA, and the NYSHRL are also assessed through the prism of the McDonnell Douglas burden-shifting framework. See, e.g., Knox v. Town of Southeast, __ F. App'x __, 2015 WL 1905859, *2 (2d Cir. Apr. 28, 2015); Zann Kwan, 737 F.3d at 843-44; Gorzynski, 596 F.3d at 110; Avillan v. Donahoe, 2015 WL 728169, *6 (S.D.N.Y. Feb. 19, 2015). To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotations omitted); see also Gorzynski, 596 F.3d at 110; Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

Broadly, "[t]he essential elements of a retaliation claim under the NYCHRL are the same." Sotomayor, 862 F. Supp. 2d at 262 (citing cases). However, the post-Restoration Act NYCHRL includes a somewhat more flexible retaliation standard than under Title VII. See, e.g., Mihalik, 715 F.3d at 113 (quoting Williams, 61 A.D.3d at 70-71, 872 N.Y.S.2d at 34); Encarnacion v. Isabella Geriatric

77

Ctr., Inc., 2014 WL 7008946, *10 (S.D.N.Y. Dec. 12, 2014); Pacheco v. Comprehensive Pharmacy Servs., 2013 WL 6087382, *16 (S.D.N.Y. Nov. 19, 2013); Sotomayor, 862 F. Supp. 2d at 262; accord Khan v. Hilton Worldwide, Inc., 2015 WL 738108, *6 (S.D.N.Y. Feb. 20, 2015). Under City law, "no challenged conduct may be deemed nonretaliatory unless a jury could not reasonably conclude from the evidence that such conduct was . . . reasonably likely to deter a person from engaging in protected activity." Mihalik, 715 F.3d at 112 (internal quotations omitted). Although the "functional difference, if any, between the CHRL standard and that used for federal and state retaliation claims has never been fully articulated," Fincher v. Depository Trust & Clearing Group, 604 F.3d 712, 723 (2d Cir. 2010), courts have framed the core distinction as the absence of a materiality requirement for any adverse action under City-law claims. See, e.g., Brown, 2013 WL 3789091 at *19. "Otherwise, a prima facie case of retaliation faces the same requirements under the NYCHRL as under the NYSHRL." Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012).

Nevertheless, "that the NYCHRL encompasses a broader standard does not absolve [a plaintiff] from putting forth evidence tending to show a causal connection between [his or her] action opposing

[the employer's] alleged discrimination and the alleged adverse actions." E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d at 862; accord Dixon v. Int'l Fed. of Accountants, 416 F. App'x 107, 110 n.1 (2d Cir. 2011) ("[Plaintiff's] claim under the NYCHRL fails as a matter of law because she did not produce any admissible evidence to demonstrate a causal connection between her protected activity and any allegedly adverse action."); Adams v. City of New York, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011) ("The broad remedial purpose of the NYCHRL does not change the requirement for a causal connection between the protected activity and the adverse employment action.").

   With respect to alleged protected activity, we note that plaintiff does repeatedly make reference to complaints that he lodged with an NYU "equal opportunity" office. (See EEOC Intake § 15 & Attach. 1 to Affirm in Opp.). Although we are not told when these complaints were made or what form they took, it is possible that an amended pleading could state facts sufficient to allege this element of a retaliation claim, which only requires some minimal showing of opposition to prohibited discrimination. See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive

statutory protection[.] [T]his notion of opposition includes activities such as making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed former charges.") (internal quotations omitted); Giscombe v. New York City Dep't of Educ., 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) ("A protected activity is action that protests or opposes statutorily prohibited discrimination.") (internal quotation omitted); Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) ("The complaint can be informal -- an employee does not need to lodge a formal complaint of discrimination . . . Plaintiff's actions in filing internal EEO complaints . . . are protect activities.") (citing cases).

At the moment, we cannot say whether plaintiff's equal opportunity complaints suffice as protected activity under relevant case-law. Nor, we add, does the union grievance appear on its face to have been about discrimination at all, and thus we also cannot construe that undertaking as protected activity. See, e.g., 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.") (emphasis added). If plaintiff's

account of the circumstances surrounding the arbitration differs
from what was presented in the arbitrator's decision, he has not
shared it with the court. There are simply not enough facts
contained in plaintiff's submissions to conclude that he engaged in
protected activity. This omission, by itself, justifies dismissal
of these claims without prejudice to repleading.

Moreover, insofar as plaintiff alleges that he was subjected
to retaliatory adverse actions within the limitations periods --
which itself is unclear from his submissions both to the EEOC and
to the court -- we recommend that his claims be dismissed without
prejudice under Title VII, the ADEA, the NYSHRL, and the NYCHRL.
Plaintiff provides no specific allegations whatsoever to causally
link adverse employment actions -- material or otherwise -- to
protected activity on his part. He merely conclusorily states that
he was "forced . . . to retire due to man[a]g[e]ment retaliation."
(Compl. p. 3).

"A causal connection between the protected activity and the
adverse action may be demonstrated by showing (1) direct proof of
retaliatory animus directed against the [p]laintiff, (2) disparate
treatment of similarly situated employees, or (3) that the
retaliatory action occurred close in time to the protected

activities." <u>Dudley v. New York City Hous. Auth.</u>, 2014 WL 5003799, *26 (S.D.N.Y. Sept. 30, 2014) (quoting cases). Plaintiff here provides absolutely no evidence suggestive of animus. Nor does he detail in even a minimal fashion what sorts of adverse employment actions he suffered, whether these actions were directed at him personally, or when they took place. Since a plaintiff's burden to make out a retaliation claim "has been characterized as 'minimal' and '<u>de minimis</u>,'" <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005), an amended pleading may very well pass muster under Rule 12. For now, plaintiff's proffer is insufficient and his retaliation claims should be dismissed without prejudice.

As a final matter, we note that we disagree with defendants' assertion that "Plaintiff must be deemed to have . . . abandoned his retaliation claim." (Defs.' Reply. Mem. 6 n.2). Defendants remind us that "in his opposition papers, [plaintiff] asserts in entirely conclusory fashion that he was subjected to discrimination and harassment, [but] he does not address his retaliation claim at all." (<u>Id.</u>). For the proposition that such a failure constitutes abandonment of a claim, defendants cite to <u>Obal v. Deutsche Bank Nat. Trust. Co.</u>, 2015 WL 631404, *10 (S.D.N.Y. Feb. 13, 2015).

82

In <u>Obal</u>, Judge Sweet deemed certain of the plaintiff's claims abandoned for having gone unchallenged in his opposition, and he quoted two additional cases for the same principle. <u>Id.</u> (quoting <u>Adams v. New York State Educ. Dep't</u>, 752 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) & <u>McDonald v. Bd. of Educ. of City of New York</u>, 2001 WL 840254, *9 (S.D.N.Y. July 25, 2001)). However, each of these cases is plainly distinguishable. In <u>Obal</u>, although a <u>pro se</u>, plaintiff had drafted a lengthy and at least facially sophisticated Second Amended Complaint. <u>See</u> <u>Obal</u>, 14-cv-2463, at docket no. 11. Plaintiff's opposition memorandum was similarly comprehensive. <u>Id.</u> at docket no. 20. The procedural posture of that case does not remotely resemble that which is before us here, namely, a motion to dismiss the first and only complaint of a clearly untutored <u>pro se</u> litigant seeking to vindicate his civil rights. Indeed, neither of the cases cited in <u>Obal</u> assessed <u>pro se</u> submissions.[25]

We are in any event recommending dismissal of plaintiff's retaliation claims, but his failure to explicitly oppose defendants' arguments should not warrant any more severe sanction at this stage. <u>Accord</u> <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made --

---

[25] In <u>Adams</u>, the plaintiffs had been <u>pro se</u> through two amended complaints, but retained counsel for their third and fourth attempts at pleading. 752 F. Supp. 2d at 424.

i.e., referencing some claims or defenses but not others -- a distinction between pro se and counseled responses is appropriate."); Allyn v. Rockland Cnty., 2013 WL 4038602, *6 n.4 (S.D.N.Y. July 30, 2013) ("Although failure to provide an argument on a point at issue can constitute abandonment of a claim, given plaintiff's pro se status, the Court will nevertheless address these claims on the merits.") (internal citation omitted).


IV. Dismissal of Individual Defendants


Plaintiff sues both NYU, his former employer, and four individual defendants. In doing so, he does not distinguish between the federal statutes and the State and City laws. However, "[i]t is axiomatic that Title VII does not provide a cause of action against individual defendants." Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 267 (S.D.N.Y. 2007) (citing cases); see also Lore v. City of Syracuse, 670 F.3d 127, 143-44 (2d Cir. 2012). The same holds true for the ADEA. See, e.g., Guerra v. Jones, 421 F. App'x 15, 17 (2d Cir. 2011); Carter v. Verizon, 2015 WL 247344, *16 (S.D.N.Y. Jan. 20, 2015); Spinelli v. City of New York, 2014 WL 4828814, *2 (S.D.N.Y. Sept. 24, 2014).[26]

---

[26] We note that both the NYSHRL and the NYCHRL recognize individual liability in certain contexts. See, e.g., Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 393 (S.D.N.Y. 2014);

In defendants' motion papers, they do not seek dismissal under these federal statutes of the individuals named in the complaint. Nevertheless, it is abundantly clear that neither Title VII nor the ADEA contemplates liability by individual defendants -- clarity reflected in the willingness shown by numerous courts to dismiss such claims <u>sua sponte</u>. <u>See</u>, <u>e.g.</u>, <u>Johnson v. New York Dep't of Corr. Servs. & Comty. Supervision</u>, 2012 WL 1191538, *3 (W.D.N.Y. Apr. 9, 2012); <u>Jiggetts v. Diaz</u>, 2009 WL 749575, *1 n.1 (S.D.N.Y. Mar. 20, 2009); <u>Burke v. Also Cornerstone</u>, 2008 WL 3891737, *1 (D. Conn. July 16, 2008). We therefore recommend that plaintiff's claims under Title VII and the ADEA, as against the individual defendants, be dismissed with prejudice.

## CONCLUSION

For the reasons stated, we recommend that defendants' motion to dismiss be granted in part. Plaintiff's claims for failure to promote under Title VII, the ADEA, and the NYSHRL should be dismissed with prejudice. Plaintiff's claims for unequal terms and conditions of employment under Title VII and the ADEA should be entirely dismissed with prejudice. Plaintiff's parallel claim under

---

<u>Davis-Bell v. Columbia Univ.</u>, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012).

the NYSHRL should be dismissed with prejudice for the period prior
to May 1, 2011. Each of plaintiff's claims against the individual
defendants under Title VII and the ADEA should also be dismissed
with prejudice. All of plaintiff's other claims should be dismissed
without prejudice.

In so recommending, we emphasize that "[w]here a cause of
action is dismissed due to deficient pleading, leave to amend
should generally be granted . . . especially . . . where, as here,
a litigant proceeds pro se." Watkins v. City of New York Kings
Cnty., 2014 WL 4075769, *4 (E.D.N.Y. Aug. 15, 2014) (citing cases).
Indeed, as the Second Circuit has emphasized time and again, "[a]
pro se complaint should not be dismissed without the Court granting
leave to amend at least once when a liberal reading of the
complaint gives any indication that a valid claim might be stated."
Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (quoting Chavis v.
Chappius, 618 F.3d 162, 170 (2d Cir. 2010)). Still, "leave to amend
a complaint may be denied when amendment would be futile." Nielsen,
746 F.3d at 62 (quoting Tocker v. Philip Morris Cos., 470 F.3d 481,
491 (2d Cir. 2006)).[27]

---

[27] Futility is often discerned when plaintiff's claims fall
outside an applicable statute of limitations. See, e.g., Grace v.
Rosenstock, 228 F.3d 40, 53-54 (2d Cir. 2000) (quoting Forman v.
Davis, 371 U.S. 178, 182 (1962)); Vargas v. Ciarletta, 2010 WL
4447636, *1 (S.D.N.Y. Nov. 4, 2010).

While there is not enough in the current complaint to permit plaintiff to "unlock the doors of discovery," Iqbal, 556 U.S. at 678, in consideration of his pro se status, he should be afforded another chance to find his keys.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 1310, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d); Thomas v. Arn, 474 U.S. 140, 150 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated:     New York, New York
           May 21, 2015

_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

87

Copies of the foregoing Report & Recommendation have been mailed today to:

**Hassan S. Mohamed**
64-11 136th Street
Flushing, NY 11367
PRO SE

**Mercedes Colwin, Esq.**
Gordon & Rees , LLP
1 Battery Plaza, 28th Floor
New York, NY 10004

**Kuuku Angate Minnah-Donkoh, Esq.**
**Sarir Zandi Silver, Esq.**
Gordon & Rees, LLP
90 Broad Street
New York, NY 10004